*In re* ESTATE OF FLOYD HINTHORN, Deceased—(Laura Mae Hinthorn, Independent Adm'r of the Estate of Floyd Hinthorn, Petitioner-Appellee and Cross-Appellant, *v.* Virgal Hinthorn, Respondent-Appellant and Cross-Appellee).

Fourth District   No. 4—82—0704

Opinion filed July 6, 1983.

Arthur N. Laudeman, of Bach & Laudeman, Ltd., of Bloomington, for appellant.

Ralph Turner, of Luedtke, Hartweg & Turner, of Bloomington, for appellee.

JUSTICE GREEN delivered the opinion of the court:

Petitioner, Laura Mae Hinthorn, was appointed independent administrator (Ill. Rev. Stat. 1981, ch. 110½, par. 28—1) of the estate of Floyd Hinthorn, deceased, on March 3, 1982, by the circuit court of McLean County. On June 29, 1982, pursuant to her request, the court entered an order for issuance of a citation against respondent, Virgal Hinthorn, for recovery of (1) funds of decedent, Floyd Hinthorn, "represented by National Bank of Bloomington Investment 89 Certificate No. 1027 in the amount of $17,288," and (2) a certain truck. (Ill. Rev. Stat. 1981, ch. 110½, par. 16—1.) On August 11, 1982, and after a hearing, the court ordered respondent to deliver to petitioner, as administrator, funds from the investment certificate in the sum of $12,288, and the truck, all within seven days.

Respondent, Virgal Hinthorn, has appealed, maintaining that all of the funds invested in the certificate had been given him by the deceased. Virgal does not dispute the estate's entitlement to the truck. Petitioner, Laura Mae, has cross-appealed, asserting that the estate was entitled to all of the funds invested in the certificate. We have jurisdiction by virtue of Supreme Court Rule 304(b) (87 Ill. 2d R. 304(b)). We affirm.

By the terms of section 16—1(d) of the Probate Act of 1975 (Ill. Rev. Stat. 1981, ch. 110½, par. 16—1(d)), upon issuance of a citation to recover property, the court "may determine all questions of title, claims of adverse title and the right of property" to the personalty which is the subject of the citation. Interpreting the statutory provision prior to section 16, the appellate court stated that citation proceedings brought by a personal representative are of two categories (1) to obtain discovery as to assets of the estate, and (2) to determine right and title to personal property. That court also stated that the latter determination may be made only when the court is requested to do so. (*In re Estate of Weisberg* (1978), 62 Ill. App. 3d 578,

585, 378 N.E.2d 1152, 1157.) Here, petitioner had previously obtained citations for discovery purposes. She then filed the instant petition which asked for return of the subject property and a judgment for any property which had been converted. Respondent was adequately apprised that a determination of right and title to the property was requested.

Commendably, the parties have stipulated to certain aspects of a series of events out of which the dispute has arisen.

Petitioner, Laura Mae Hinthorn, is the widow of the deceased and was estranged from him for the 10 to 15 years immediately prior to his death. Respondent is the brother of the decedent. In July 1981 decedent, Floyd Hinthorn, became ill and was hospitalized at the Veterans Administration Hospital in Danville. He remained there and at a similar hospital in Indianapolis until his death. Prior to August 3, 1981, Floyd was the owner of a savings account at the National Bank of Bloomington which on that date had a balance of $17,299.74. On that day Floyd and Virgal executed documents to change that account to one held by the two of them in joint tenancy with the right of survivorship. Later that same day, Floyd withdrew $10,000 from that account and placed it in a certificate of deposit issued by the above bank in the name of Virgal and Floyd as joint tenants with right of survivorship. Under both arrangements interest payments from the accounts were to be reported under Floyd's social security number. The interest from the certificate of deposit was to be placed in the joint savings account.

On January 7, 1982, the sum of $10,400 was withdrawn from the joint tenancy savings account pursuant to a withdrawal slip executed by Mary A. Hinthorn, wife of respondent, in the name of "Virgal Hinthorn, Trustee for Floyd Hinthorn." This money was used to purchase an investment repurchase agreement with the National Bank of Bloomington in the names of "Mary A. and Virgal Hinthorn, Trustee for Floyd Hinthorn." The interest from this account was also to be reported under Floyd's social security number. On January 15, 1982, respondent filed an application for an Internal Revenue Service identification number for the "Floyd Hinthorn Trust." On January 19, 1982, the above repurchase agreement was placed in the name of "Virgal or Mary Hinthorn," and with interest to be reported under Virgal's social security number.

Floyd Hinthorn died at Indianapolis on January 23, 1982. Just prior thereto, on January 21, 1982, the certificate of deposit was transferred by respondent to an account in the name of "Virgal or Mary Hinthorn." Interest was to be reported to Virgal's identification

number. Thus, on the date of Floyd Hinthorn's death, none of the accounts or agreements were in Floyd Hinthorn's name nor was ownership in any of them stated to be contingent upon surviving him.

On February 24, 1982, the account created on January 21, 1982, was terminated. A check for $2,747 payable to respondent was executed and the proceeds used for expenses of decedent's burial. The balance of the money held under the agreement was used for the issuance of a similar agreement in the names of "Virgal or Mary Hinthorn." Then, on April 27, 1982, the sums deposited under the two repurchase agreements were rendered into one such agreement standing in the names of "Mary or Virgal Hinthorn." Its principal balance was the $17,288 investment certificate referred to in the citation.

The evidence showed that Virgal had visited the deceased regularly and would have been a logical object of Floyd's beneficence. Virgal testified that prior to entering the hospital the deceased had told respondent he wanted to give respondent $5,000, stating that was "outright." Respondent testified the deceased said " 'That's yours' " and then said:

> " 'I'm going to give you the money, and I want to fix it so you can take care of it, then, so I can have access to it, if I get out of here, but if I don't get out of here, then it's yours.' "

Based largely on this testimony, the trial court found that Floyd had intended to make an *inter vivos* gift of $5,000 to Virgal.

Virgal subsequently obtained the documents to set up the original joint tenancy account and took them to decedent who was then in the hospital. Both Virgal and his wife, Mary, admitted in their testimony that Floyd did not read well and indicated it was unlikely that he read the documents although he did sign them. Virgal testified that the only directions the deceased gave in setting up the accounts was that it be one upon which either could draw. Virgal also testified that decedent desired to trade in his truck and buy a new one if he survived and wanted to have the money to do it. Mary Hinthorn supported respondent's testimony that Floyd had stated he wanted Virgal to help him manage his money and wanted Virgal to have the money if he died.

In making its decision, the trial court found: (1) A fiduciary relationship existed between Floyd and Virgal beginning in July 1981 and continued until the time of death; (2) respondent failed to establish that decedent had a donative intent as to all of the funds at issue; (3) that the conduct of Virgal and Mary with regard to all of the money in Floyd's accounts, except for $5,000, was inconsistent with their having received a gift; (4) that even in the absence of a fiduciary rela-

tionship, the estate's evidence overcame any presumption of donative intent on the part of Floyd "as the bulk of the funds;" and (5) that the evidence was sufficient to support a finding that Floyd intended to make a $5,000 gift to Virgal, but that the remainder of money in question was secured "by virtue of a trust reposed in [Virgal] by [Floyd] and was not a gift."

■ Because the issues on the cross-appeal are simpler, we consider them first. The trial court could have believed Virgal's testimony that Floyd told him the sum of $5,000 was his outright. The circumstances of the conversation were such that delivery of the money by Virgal on behalf of Floyd to himself could be implied. The creation, before Floyd's death, of the investment account in such a manner as to show no interest in Floyd accomplished a delivery as to the $5,000. The portion of the judgment from which cross-appeal is taken is affirmed.

Turning to the original appeal, we note that even accepting Virgal or Mary Hinthorn's testimony at face value, there is little indication that Floyd intended to make any *inter vivos* gift to Virgal beyond that of $5,000. The tenor of that evidence was that Floyd wanted the balance of the money to be available if he survived.

If Virgal (1) had not destroyed all joint tenancy accounts, and (2) had owed no fiduciary duty to Floyd, there would have been a strong presumption that Floyd had an intention to make a gift to Virgal of those accounts after his death. (*Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 202 N.E.2d 470; *Frey v. Wubbena* (1962), 26 Ill. 2d 62, 185 N.E.2d 850.) Any interest in the accounts held by Floyd during his lifetime would pass, by operation of law, to Virgal upon Floyd's death. As that rule of law could not operate on property not in the required type of account, property in which Floyd retained an interest in his lifetime could pass to Virgal, in the absence of a will, only if a gift *causa mortis* had been made.

■ In order to prove a gift *causa mortis* the donee has the burden of proving: (1) The donor was stricken with a condition making death eminent; (2) the donor's death must result from that condition without intervening recovery; (3) the gift must have been made to take effect only if the donor died of that disorder; and (4) there must have been delivery of the subject of the gift. (*In re Estate of Vardalos* (1974), 24 Ill. App. 3d 520, 320 N.E.2d 568.) Unlike the situation where a joint survivorship account has been created, there is not necessarily a presumption of donative intent upon the transferor of the property.

■ The question of whether Virgal had a fiduciary relationship

with Floyd is of significance in several respects. An appellate court has held that when property is transferred to a fiduciary, a gift is never presumed. (*In re Estate of La Rue* (1964), 53 Ill. App. 2d 467, 476, 203 N.E.2d 47, 51.) Secondly, the trial court considered that Virgal's conduct before Floyd's death, in having the funds placed in accounts in which Floyd was not shown to have any interest, was a breach of fiduciary duty which Virgal would not likely have engaged in had Floyd really indicated an intent for Virgal to have survivorship rights as to all of the funds.

The case of *In re Estate of La Rue* is closely in point. There an elderly and feeble mother had set up joint tenancy with right of survivorship bank accounts with her son. She directed him to spend the money for her benefit within his discretion. He had spent some of the money for his own use and dissipated the account before her death. The appellate court affirmed a trial court order requiring the son to reimburse her estate for the money he had used for his own benefit. The appellate court held that the evidence supported a finding of the existence of a fiduciary relationship.

The fact that Floyd and Virgal were brothers was, of course, insufficient to establish a fiduciary relationship. (*Clark v. Clark* (1947), 398 Ill. 592, 76 N.E.2d 446; *Ziarko v. Ziarko* (1974), 22 Ill. App. 3d 520, 318 N.E.2d 1.) The essence of the relationship is the trust and confidence placed in the fiduciary (*Clark*). Floyd's dependence upon Virgal and the trust and confidence placed in Virgal were similar to the situation regarding the mother and the son in *La Rue*. Floyd's severe illness and resulting disability here were similar to that of the mother resulting from old age and weakness in that case. This case differs from *In re Estate of Eiberger* (1978), 60 Ill. App. 3d 790, 376 N.E.2d 793, cited by Virgal. There, no evidence was presented that the one alleged to be a fiduciary had ever transacted business for the person claimed to be influenced by the alleged fiduciary. The evidence here supported a determination that Virgal was a fiduciary of Floyd.

The finding that Virgal breached the fiduciary relationship was also supported. As we have stated, even under his theory of the evidence, Virgal was not to have full dominion over the sums in excess of $5,000 during Floyd's life, but by the time of Floyd's death he had placed all of those sums in accounts standing in his name and that of his wife. There was also evidence that on January 21, 1982, in converting the certificate of deposit to repurchase agreement funds, Virgal converted an instrument drawing interest at a rate of 15% to one drawing interest at a rate of 11% and incurred an early withdrawal penalty of $365 in so doing. According to Virgal's testimony,

this was in violation of a direction Floyd had given to him to obtain the highest possible interest on his money.

The *La Rue* court seemed to hold that if the son had breached his fiduciary duty to his mother by improper expenditure of funds in the survivorship account, he would not be excused from making restitution to the estate even if she had intended that he have the remaining funds upon her death. By that rationale, Virgal would not be entitled to keep funds that had been removed from the joint accounts with Floyd even if Floyd had intended that Virgal have the remaining funds upon Floyd's death. See also *Hazen v. Elmendorf* (1962), 365 Mich. 624, 113 N.W.2d 892.

█ Regardless of any theory that Virgal's breach of duty should be punished, we do not find the trial court's determination that Floyd had no donative intent to make a gift of more than $5,000 to be contrary to the manifest weight of the evidence. Under the circumstances, there was no presumption of gift. The evidence of any such gift came largely from the self-serving testimony of the claimed donee and his wife, who would also benefit thereby. As is often the case, the estate had little opportunity to directly rebut this testimony. It was subject to strict scrutiny. (*In re Estate of Skinner* (1969), 111 Ill. App. 2d 267, 250 N.E.2d 295.) As the trial court pointed out, the conduct of Virgal and his wife in breaching the directions they stated Floyd gave them casts substantial suspicion on their testimony. Although Floyd would have likely preferred his brother to have his property rather than his estranged wife, we will not overturn the decision of the trial court that heard and observed the witnesses.

We affirm as to the appeal and cross-appeal.

Affirmed.

TRAPP and MILLER, JJ., concur.